**James Lynn McNALLY, Plaintiff,**

v.

**CHOCTAW MAID FARMS, INC., Defendant.**

**Civil Action No. 3:97–cv–155WS.**

United States District Court,
S.D. Mississippi,
Jackson Division.

Feb. 25, 1998.

James G. McIntyre, Jackson, MS, for James Lynn McNally.

Michael Farrell, Rick A. Hammond, The Kullman Firm, Jackson, MS, for Choctaw Maid Farms, Inc.

### *MEMORANDUM OPINION AND ORDER*

WINGATE, District Judge.

Before this court is the motion of the defendant, Choctaw Maid Farms, Inc., for summary judgment brought pursuant to Rule 56(b),[1] Federal Rules of Civil Procedure. Plaintiff James Lynn McNally, whose lawsuit against the defendant is structured

---

1. Rule 56(b) of the Federal Rules of Civil Procedure provides:

(b) For Defending Party. A party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

upon the Americans With Disabilities Act ("ADA"), Title 42 U.S.C. § 12101, *et seq.*, opposes the motion. Persuaded by the applicable law and undisputed material facts, this court hereby grants defendant's motion.

## I. *Facts*

James L. McNally ("plaintiff") was employed by Choctaw Maid as the live haul manager in Carthage, Mississippi, beginning in September, 1994. **Exhibit 1, Plaintiff's Depo. pp. 18–19.** In October, 1995, while walking on top of a 20–foot high fuel tank, the plaintiff says he felt his foot "slip" but he did not fall nor feel any pain at the time. **Exhibit 1, pp. 51–52.** The incident occurred mid-morning, and the plaintiff completed his shift without difficulty. *Id.* He continued working and took no leave. **Exhibit 1, pp. 53–54.**

The plaintiff reported the incident to his supervisor, Robin Flake, but stated that this type of incident was "pretty common" and he did not need to see a doctor. **Exhibit 1, pp. 54–55.** Approximately 30 days after the incident on top of the fuel tank, the plaintiff helped some co-workers shovel feed from a truck after it had turned over, and he felt the pain in his back increase. **Exhibit 1, pp. 56–57.** However, this incident also did not prompt the plaintiff to see a doctor, and he continued to perform all aspects of his job. **Exhibit 1, pp. 57–58.** As the plaintiff put it, "It wasn't disabilitating. It didn't prevent me from doing the things I had to do, even though it was there." **Exhibit 1, p. 57.** The plaintiff further testified:

Q: You could still do everything you had to do for your job?

A: Yeah, I just did things a little more carefully.

**Exhibit 1, p. 57.**

Q: There were some things that I was having a real difficult time doing, like getting out of bed and going to work. But as far as I know, the whole time I was with the company, when it got real bad, I think I missed one day, other than the times I was at a doc-

tor's office, went to the doctor. So I attempted to work.

**Exhibit 1, p. 44.**

Eventually, the plaintiff decided to see a doctor, but the diagnosis revealed bulging disks—not a serious condition which could be remedied through surgery. **Exhibit 1, pp. 58–59, 62.** Instead, the plaintiff began receiving therapy and epidural steroid injections. **Exhibit 1, pp. 62–64.** Throughout treatment, the plaintiff continued to work and the only necessary job duty changes were implemented unilaterally by the plaintiff himself—he began riding with the drivers less and he no longer checked the fuel levels in the storage tanks. **Exhibit 1, pp. 64–66.** Choctaw Maid agreed to the plaintiff's job duty changes and hired off-duty Mississippi Highway Patrolmen to ride with and evaluate drivers in place of the plaintiff. **Exhibit 1, pp. 65–66; Exhibit 2, Declaration of Jeff Long.**

With regard to his ability to continue working after the injury, the plaintiff testified:

Q: Did your condition prevent you from being able to perform those aspects of your job [standing, testing drivers, walking the yard], or did you, in fact, continue to do those things?

A: *I, in fact, continued to do those things with the pain.*

Q: Work through the pain, as they say?

A: *Yes.*

**Exhibit 1, pp. 60–61 (emphasis added).**

Primarily as a result of a severe feed shortage during the winter and spring months in early 1996 which the company attributed to the plaintiff, Raymond Wilbanks, the plaintiff's supervisor, demoted the plaintiff to fleet safety supervisor[2] in July, 1996. **Exhibit 1, pp. 32, 34–37, 42–43; Exhibit 2.** As fleet safety supervisor, the plaintiff was counseled on numerous occasions by his supervisor, Gary Walls, about job performance. Many of the reprimands dealt with the plaintiff's failure to keep records up to

---

2. The duties of the plaintiff's new position were to hire drivers, maintain DOT files for drivers, train drivers, supervise drug testing of drivers, and conduct safety testing for drivers. **Exhibit 1, p. 39.**

date as requested by his supervisor. **Exhibit 1, pp. 45–46; Exhibit 3, Minutes of 11–8–96 Meeting, last paragraph (previously identified at pp. 46 & 49 of Exhibit 1).** The plaintiff also admitted that on more than one occasion he had talked to Jeff Long, the Director of Human Services, about his poor job performance and had admitted that he needed to improve. **Exhibit 1, pp. 43–44, 66–69.**

In December, 1996, following several months of poor job performance in the new fleet safety supervisor position, the plaintiff met with Jeff Long. Long told the plaintiff that his performance was unacceptable and that he had two options: resign that day (and receive his three weeks of vacation pay and his salary through January and the company would not contest his application for unemployment compensation benefits); or wait for the results of an audit of the files required to be maintained by the plaintiff. **Exhibit 1, pp. 81–84; Exhibit 2.** If the audit revealed unsatisfactory performance, Long told the plaintiff he would be terminated. *Id.* The plaintiff resigned that day. **Exhibit 1, p. 85.**

After the plaintiff resigned from Choctaw Maid, his medical condition became more serious. He had surgery in January, 1997. **Exhibit 1, pp. 69–70; Exhibit 4, Operative Record of Dr. Lon Alexander.** Apparently, not even the plaintiff knew at the time he was asked to resign that surgery would be necessary the next month. In the days immediately preceding the company's request for his resignation, the plaintiff had been seen by two doctors who both had found nothing remarkable about the plaintiff's condition and who both had commented on his continued recovery in their medical records. **Exhibit 5, Notes of Dr. Walter L. Willis dated December 6, 1996; Exhibit 6, Notes of Dr. Jeff Summers dated December 9, 1996.** These two doctors were Dr. Walter L. Willis and Dr. Jeff Summers. The plaintiff

was asked to resign two days after he had been examined by Dr. Summers.

The surgery in January, 1997, had complications; the plaintiff developed a staph infection from this surgery and had to undergo another procedure in March, 1997, the month this suit was filed. His recovery was slow. **Exhibit 1, pp. 76, 92–93; Exhibit 7, Operative Record of Dr. Alexandre Solomon.** He is scheduled for another surgery because of his continued complaints of back pain. **Exhibit 1, pp. 76, 92–93.**

The plaintiff filed his Equal Employment Opportunity Commission ("EEOC") complaint on January 10, 1997, and received his right-to-sue letter on February 28, 1997.[3] The plaintiff filed the instant suit in March, 1997, alleging violations of the ADA.

## II. *Summary Judgment Standard*

The defendant Choctaw Maid Farms, Inc., now seeks summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure which provides that "[a] party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." In *Evans v. City of Marlin, Texas,* 986 F.2d 104 (5th Cir.1993), the Fifth Circuit summarized the standard of review for summary judgments, stating that "[s]ummary judgment is appropriate if the record discloses that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." ... The pleadings, depositions, admissions, and answers to interrogatories, together with affidavits, must demonstrate that no genuine issue of material fact remains. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To that end we must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986). If the record

---

3. As dictated by Title 42 U.S.C. § 2000e–5(e), before a plaintiff may pursue a claim in federal court, the plaintiff must first exhaust the administrative remedy of filing the complaint with the Equal Employment Opportunity Commission within 180 days of the date of the discriminatory act in question. *Delaware State College v. Ricks,*

449 U.S. 250, 256, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 555, 97 S.Ct. 1885, 1887, 52 L.Ed.2d 571 (1977); *Sessom v. Milwaukee Distribution Center, Inc.,* 645 F.Supp. 202, 204 (N.D.Miss.1986).

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) .... Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." In this court's view, Rule 56(c) requires this court to enter summary judgment in favor of the defendant inasmuch as the evidence favoring the plaintiff is not sufficient for the jury to enter a verdict in his favor. *See Washington v. Armstrong World Industries, Inc.,* 839 F.2d 1121, 1122–1123 (5th Cir.1988), citing *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### III. *Prima Facie Case Under the ADA*

■ The ADA was enacted in 1990 to ensure that disabled individuals are treated equally to non-disabled persons and "to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities." 29 C.F.R. § 1630 Appendix (1996); 42 U.S.C. § 12101 (1996). Thus, the Act does not require "affirmative action" or preferential treatment for disabled individuals, *Daugherty v. El Paso,* 56 F.3d 695, 700 (5th Cir.1995), *cert. denied,* 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 211 (1996); *Pegues v. Emerson Electric Co.,* 913 F.Supp. 976, 981–82 (N.D.Miss.1996); *McCollough v. Atlanta Beverage Co.,* 929 F.Supp. 1489, 1504–05 (N.D.Ga.1996); only that they not be the recipients of discrimination on account of their disabilities.

The ADA does not protect all persons who suffer an injury at work; rather, it protects only those individuals who are "disabled" and who are "qualified." The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

Title 42 U.S.C. § 12102(2).

Courts determining whether an impairment "substantially limits" a major life activity should consider:

(i) the nature and severity of the impairment;

(ii) the duration or expected duration of the impairment; and

(iii) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). The EEOC Regulations which implement the ADA explain that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis and influenza." 29 C.F.R. § 1630 Appendix at 1630.2(j).

In many cases, back injuries fit within the scope of this latter regulation. In *Rakestraw v. Carpenter Co.,* 898 F.Supp. 386 (N.D.Miss. 1995), the plaintiff was a truck driver who over-exerted himself and injured his back while lifting foam used to manufacture furniture. *Rakestraw,* 898 F.Supp. at 388. After being terminated for reasons unrelated to his back injury, the plaintiff sued, alleging discrimination under the ADA. *Id.* Plaintiff's employer filed a motion for summary judgment. In discussing the merits of the motion, the Court stated, "Temporary injuries with no permanent effects are typically not considered disabilities under the ADA." *Id.* at 390, citing *Oswalt v. Sara Lee Corp.,* 889 F.Supp. 253, 257 (N.D.Miss.1995), *aff'd,* 74 F.3d 91 (5th Cir.1996); *Evans v. City of Dallas,* 861 F.2d 846, 852–53 (5th Cir.1988) (Rehabilitation Act case). This Court added that other courts have specifically held that "back injuries of limited duration do not constitute a handicap." *Id.,* citing *Jones v. Ala-*

*bama Power Co.,* No. CV–94–PT–0094–S, 1995 WL 238338 (N.D.Ala.1995), *aff'd,* 77 F.3d 498 (11th Cir.1996); *Paegle v. Department of the Interior,* 813 F.Supp. 61, 62 (D.D.C.1993); *Visarraga v. Garrett,* No. C–88–2828–FMS (CW), 1993 WL 209997 (N.D.Cal.1992).

■ To state a claim of disability discrimination, a plaintiff must prove that: (1) he has a "disability;" (2) he is a "qualified individual;" (3) he has suffered adverse employment action; and (4) he was treated less favorably than non-disabled persons. *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090,, 1092 (5th Cir.1996); *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995).

The plaintiff must show evidence of a genuine issue of material fact with regard to each step of the prima facie case; otherwise, the defendant is entitled to summary judgment.

### IV. *Plaintiff's "Disability"*

■ The undisputed facts and the plaintiff's admissions confirm that the plaintiff was not disabled while employed at Choctaw Maid. True, the plaintiff may have suffered an injury on the job; Choctaw Maid's workers' compensation department has handled these claims—up to and including the scheduled surgery. However, the facts show that prior [4] to his resignation the plaintiff was not disabled since he was physically able to continue performing his job and his condition did not substantially limit him in any major life activity.[5]

### V. *Plaintiff's Charge of Discrimination*

The plaintiff's claim also fails because his demotion in July, 1996, and his resignation in December, 1996, raise no inference of discrimination. Both actions are supported by legitimate, non-discriminatory reasons, and

plaintiff has not come forward with any contrary evidence which creates a genuine issue of material fact on this point.

When asked about what evidence he had to support his contention that he had been demoted as a result of his medical condition, the plaintiff participated in the following exchange:

Q: What I'd like to know is how Choctaw Maid's treatment of you led to your assertion that you're entitled to damages for treatment.

A: I think I was reduced down on my job to start with. It was for other reasons than job performance.

Q: You mean when you were demoted to the safety fleet?

A: Demoted, yes. They have enough documents to prove that assertion because they can go back on all their records and look and see the feed that was being hauled that was being produced, so it was for something other than that. *I can't say their intention was for medical reasons.* All I know is I was hurting then and I was in pain, but *I can't tell you what Choctaw Maid's motivation was.* I can only claim to the fact that I know that I was demoted and lost the wages, was humiliated in front of employees because *I was perceived as doing an awful job. That's why I was demoted.*

Q: Okay. What evidence do you have to support your contention that you were demoted and received a pay cut because of your medical condition?

A: *I don't have any, other than my belief that that was part of it ....*

**Exhibit 1, pp. 95–96 (emphasis added).** This evidence raises no inference of any nex-

---

**4.** Indeed, the plaintiff continued working 50 hours per week at Marshall Durbin in 1997.

**5.** The plaintiff did testify that he had difficulty holding heavy objects in his arms, such as a bag of groceries or one of his grandchildren. **Exhibit 1, pp. 59–60.** However, the plaintiff admitted that this limitation did not affect his ability to do his job. *Id.* Further, the courts routinely hold that even as much as a 25–pound lifting restriction does not constitute a disability for ADA

purposes. *Thompson v. Holy Family Hospital,* 121 F.3d 537, 539 (9th Cir.1997); *Williams v. Channel Master,* 101 F.3d at 349; *Aucutt v. Six Flags Over Mid–America,* 85 F.3d 1311, 1319 (8th Cir.1996); *Corrigan v. Perry,* 961 F.Supp. 132, 136 (E.D.Va.1997); *see also Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir.1996) (holding where plaintiff could lift and reach so long as he avoided heavy lifting, he was not disabled).

us between his medical condition and his demotion.

So, the only "evidence" offered by the plaintiff is his assertion that he believes he was discriminated against because of his medical condition. The argument of plaintiff's counsel in response to defendant's motion for summary judgment is based upon this same naked conclusion:

Mr. McNally clearly states in his deposition that the Defendant corporation had never at any time given him a written or oral reprimand for his work while employed at said corporation prior to his accident in which he injured his back, which suggests his termination was related solely to his medical and/or physical condition. Exhibit "A" pg. 36, 37, 77, 78. That in July of 1996, plaintiff was demoted from his current position of employment to a Fleet Supervisor position which resulted in a $10,000 pay cut in salary annually. Please see attached letters marked Exhibits "D," "E." One could easily draw the inference that Defendant's actions amounted to an intentional attempt to force Plaintiff James Lynn McNally to resign from the employment of Defendant corporation.

Well-recognized law relative to Rule 56 motions proclaim that a plaintiff's own unsupported speculation and conjecture are insufficient to defeat summary judgment. Fed. R.Civ.P. 56(e); see Herrera v. Millsap, 862 F.2d 1157, 1160 (5th Cir.1989); Woods v. Fed. Home Loan Bank Bd., 826 F.2d 1400, 1413–14 (5th Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988).

Next, finally seeking to clothe his charge of discrimination with some acceptable proof of a systematic cause of discrimination, plaintiff offers the following:

That this type of discriminatory practice among injured workers was common place at said corporation. That at some point prior to the actions taken against Plaintiff herein, Plaintiff in his supervisory role was asked by Jeff Long to reassign one particular truck driver to a position he would find very distasteful which Jeff Long knew would force his voluntary resignation from his employment with said corporation. Exhibit "A" p. 96–98. That this systematic course of conduct of discrimination by Defendant corporation likewise resulted in Plaintiff being terminated from the employment of said corporation.

The plaintiff has not provided a time frame for when this allegedly occurred, the name of the employee or the circumstances which led to the employee's injury. Exhibit 1, pp. 96–98. Accordingly, this court holds that these sketchy facts fail to raise an inference of discrimination.

While plaintiff's prima facie proof of discrimination is certainly lacking, defendant's proof of a legitimate ground for discharging plaintiff is manifest. Plaintiff admits as much.

In his deposition, the plaintiff admitted that an audit of his files would have revealed sufficient errors to support his termination. Exhibit 1, pp. 84–85. The plaintiff testified:

Q: If you had not resigned, would Jeff Long have been able to find reasons in the file to fire you?

A: Probably, with the—with the work load that was upon a person, if you operate at 85 or 90 percent capacity, there's still ten percent that gets undone. In the chicken business, it's always that way. You never get 100 percent done, and probably every other business, but certainly in there.

Q: What would he have found in the files that would have given him reason to fire you?

A: I have no idea.

Q: But you admit that there would have been something there—

A: Sure.

Q: —he could have found to fire you?

A: Sure. My job description, my work load was changed from week to week for a period of time. None of it got all the way completely done.

Exhibit 1, pp. 84–85.

In fact, as per affidavits submitted by the defendant, much more than just "10 percent" of the job was not performed by the plaintiff. An audit conducted by Choctaw Maid employee Linda Gray to ensure compliance with

DOT regulations revealed 54 files that were incomplete or that did not conform with DOT regulations. Also, even though company policy requires a driver file to be maintained on each driver in addition to his payroll/personnel file, Gray determined that no driver file existed for 40 of the company's drivers. **Exhibit 2.**

This evidence shows legitimate reasons for the company's request that the plaintiff resign or face potential termination for poor job performance. The plaintiff does not dispute this evidence—significantly, the plaintiff admits the files would have revealed grounds for his termination.

Under the fourth element of proof establishing a prima facie case under the ADA, plaintiff must show that he was treated less favorably than non-disabled persons. *Turco,* 101 F.3d 1090, 1092 (5th Cir.1996); *Daigle,* 70 F.3d at 396. Plaintiff has not surmounted this hurdle. Long also was concerned about the poor job performance of Gary Walls, and Long gave him the same choice that day as the plaintiff for performance reasons. Walls also chose to resign. **Exhibit 1, pp. 85–87; Exhibit 2.** Walls had not suffered any work-related injury.

### VI. *Summary*

Based upon the foregoing discussion, this court concludes that plaintiff's ADA claim lacks the juridical strength to withstand defendant's push for summary judgment. The material undisputed facts and the applicable law conjoin against plaintiff, establishing his failure of prima facie proof of a disability, that he was terminated on account of a medical condition, and that he was treated less favorably than non-disabled persons. Faced with these fatal weaknesses in plaintiff's attempt to show a prima facie case of discrimination under the ADA, this court is obligated under Rule 56 to dismiss this action with prejudice.